[Civ. No. 14054.   Second Dist., Div. Three.   Feb. 29, 1944.]

THEODORE D. RINGIS, Respondent, v. HARRY OTTING, Appellant.

Walker, Adams & Duque for Appellant.

D. A. Boone for Respondent.

WOOD (Parker), J.—In this action for damages for personal injuries resulting from the alleged negligence of defendant in firing a shotgun while plaintiff and defendant were quail hunting, plaintiff obtained judgment, in a trial without a jury, for $19,000 general damages for the loss of an eye and for minor injuries to other parts of his body, and $948.40 special damages. Defendant appeals from the judgment and asserts that (1) the amount of general damages was excessive; (2) the findings as to general damages were unsupported by the evidence; and (3) the court erred in restricting the cross-examination of plaintiff.

The evidence, in the view most favorable to plaintiff, shows: Plaintiff and defendant had been friends about three and one-half years, and had gone hunting together about fifteen times. On November 30, 1941, they went quail hunting on a ranch of defendant's friend near Lancaster. The hunting place in the vicinity of the accident was covered with sagebrush ranging from knee high to waist high, and the ground was generally flat except for a dry wash or "little depression," which varied in width from 50 to 300 feet, had gradually sloping sides from the level of the surrounding land to a depth of about two feet, and extended northerly across the ranch. Before they started to hunt, plaintiff and defendant agreed that, while hunting, they would stay in sight of each other, would walk 125 to 175 feet apart in the same direction

and would keep approximately "parallel" or equally advanced except as the distance would vary when they deviated to go around sagebrush or to pick up quail they had shot. It was a clear day, and plaintiff was wearing a red plaid shirt, green trousers and a "dirty" white hat. They proceeded to hunt in a northerly direction along the wash. When they arrived at a point where defendant was on the east side of the wash, in brush about four feet high, and plaintiff was in the center of the wash, about 125 feet to the west and left of defendant, in brush about "waist high," a quail suddenly flew out of the brush about fifteen feet to the rear of, and "between," plaintiff and defendant, and flew toward defendant. Defendant turned to his left, fired his 16-gauge shotgun, and shot the quail which was "about three feet above the brush, possibly waist high." The gun "was pointed straight at" plaintiff. A bird-shot from the charge struck plaintiff in the left eye. Other shots struck plaintiff—one on the head, one on the left side, one on the right wrist, and one on the knee. The shots, other than the one that struck in the eye, caused slight injury. Plaintiff "dropped" to the ground. Defendant, and defendant's wife and plaintiff's wife (who had accompanied them on the trip and were following behind them), went to plaintiff's assistance. A "bloody fluid" was coming from plaintiff's eye, and they went immediately to Lancaster where he received medical treatment. Then they went to Pasadena, where he received further medical attention, then to Alhambra where X-rays were taken of plaintiff's eye, and then to a hospital in Long Beach where plaintiff remained forty-six days and his eye was removed.

The trial court found defendant was negligent, and plaintiff was not contributively negligent. Defendant does not contend on this appeal that those findings were not supported by the evidence. Defendant does not make an issue as to the item of special damages.

As to defendant's first contention, that the amount of the general damages was excessive, the evidence shows: Plaintiff entered the hospital on November 30, 1941, the date of the injury, and at that time his eyeball was collapsed, and he "had a feeling of a red hot poker" in his eye. The next morning, December 1st, additional X-rays were taken, and he was removed to the operating room where a small part of the iris was removed from his injured eye, an incision

made in the cornea, the eye irrigated, and a flap of conjunctiva tissue pulled over the cornea to protect the wound and sutured in place. The lids of both eyes were closed and sutured to keep them closed, and morphine was administered to plaintiff every four or six hours for a few days. The sutures were removed from the right eye about two days later, and from the left eye about seven days later. There was a slight improvement in the injured eye for a few days, and then there was a marked inflammation of the eye, some infection of the lid, and severe pain. About two weeks later the "pain seemed to be somewhat subsided." Treatment was continued, but the eye remained in the same condition with considerable watering, irritation and pain. On January 3, 1942, plaintiff was given a general anesthetic, and his left eye was removed. A glass ball was then placed and sewed in the eye socket, preparatory to fitting an artificial eye, and kept there until January 21, 1942. Plaintiff left the hospital on January 15, 1942, at which time there was still a slight infection of the socket, and plaintiff was required to return for treatments once or twice each week. An artificial eye was placed in the socket on February 16, 1942. The vision of the right eye had not been affected, but on September 9, 1942, upon the advice of his doctor, plaintiff was required to wear glasses to relieve a strain on his right eye. At the time of the trial plaintiff was still under medical care; and twice daily plaintiff was required to irrigate his eye socket with a boric acid solution and apply an ointment thereto, and to irrigate the right eye with another solution. Mucus collected on his artificial eye, and he was required to keep a mirror with him and use it while working in order to keep the eye clean, and at times while working he had to remove the eye in order to clean it. Plaintiff's doctor testified, at the trial in October, 1942, that plaintiff probably would require medical attention for another "one or two months," for the reason that the first artificial eye, a temporary one used while the eye socket was swollen, was being replaced by another artificial eye and plaintiff should be watched to be sure it fitted properly.

The evidence shows further: Plaintiff was 40 years of age at the time of the accident. He had been employed by the Ford Motor Company at Long Beach since 1939. He worked forty hours a week only, and his salary was $215 a month

with two weeks' annual vacation. His duty was to compile complete daily schedules for the entire production. While he was in the hospital his employer informed him that his employment had been terminated. In the latter part of February, plaintiff's doctor advised him he was able to do a little work. Plaintiff thereupon applied for employment at several places, but was unable to obtain work at those places. On August 6, 1942, he obtained employment as a schedule clerk to keep records of the progress of production in the tooling department of an aircraft company, and he held that position at the time of the trial. He was hired on a forty-hour week basis, at 90¢ an hour, or $156 a month, and additional pay for overtime. With full overtime he received $260 a month. He performed his work by making the records of progress on a series of sixty-four charts, each of which was 3 feet by 4 feet in size. He could not see an entire chart at one time and constantly had to turn his head back and forth to follow the chart lines.

The matter of the amount of damages was for the determination of the trial court, upon the evidence, in the exercise of its sound discretion. An appellate court will not disturb a judgment insofar as the amount of damages is concerned unless the amount is so grossly excessive as immediately to suggest passion or prejudice. (*Loper* v. *Morrison* (1944), 23 Cal.2d 600, 610 [145 P.2d 1].) There are several reported cases in which similar amounts have been held to be proper awards for the loss of an eye. Among such cases are: *Katz* v. *Helbing* (1932), 215 Cal. 449 [10 P.2d 1001]—$30,000; *Conner* v. *East Bay Mun. Utility Dist.* (1935), 8 Cal.App.2d 613 [47 P.2d 774, 48 P.2d 982]—$20,597.93; and *Szasz* v. *Joyland Co.* (1927), 84 Cal.App. 259 [257 P. 871]—$20,000. The evidence was sufficient to justify the amount awarded.

The next contention of appellant, that the findings as to damages were unsupported by the evidence, is based upon two general findings made by reference to the complaint that the allegations of two paragraphs of the complaint were true. Those general findings, as shown by the references, were: (1) that plaintiff "has suffered a fifty per cent disability and that his future earning power will be proportionately reduced to his damage in the sum of $20,000.00"; and (2) that plaintiff has suffered excruciating pain, sustained

severe shock to his nervous system, and throughout his life will suffer "by reason of the loss of his left eye, humiliation and embarrassment . . . to his further damage in the sum of $25,000.00." Defendant asserts that if those findings were supported by the evidence the damages should have aggregated $45,000, and that said findings indicate that the "trial court did not in awarding damages exercise a cool and dispassionate discretion." In addition to the general findings, the court made specific findings: (1) that plaintiff "sustained great, grievous and permanent injuries"; and (2) that "as a result of the permanent injuries and damage proximately caused by defendant Harry Otting's negligence plaintiff has sustained damage in the sum of $19,948.40."

A specific finding controls in the event there is an inconsistency between a general finding and a specific finding. (*Lobb* v. *Brown* (1929), 208 Cal. 476, 481 [281 P. 1010]; *People* v. *Hawley* (1929), 207 Cal. 395, 403 [279 P. 136].)

Although certain paragraphs of the complaint, containing allegations as to the extent of plaintiff's pain and physical injury, were included by reference in the general findings as true allegations, the fact that such paragraphs also contained allegations that the amount of his damages was $45,000, does not indicate, in view of the specific findings, that the court did not exercise a cool and dispassionate judgment in awarding damages.

The last contention of appellant is that the court erred in restricting the cross-examination of plaintiff. That contention is based upon a ruling of the court sustaining plaintiff's objection to a question by defendant which, in substance, was whether plaintiff had told various persons that the accident was unavoidable. Before that objection was sustained, the same question was asked in varying language several times, and was answered. On cross-examination defendant asked plaintiff whether he had told the investigating officers that it was an accident and nobody was to blame. Plaintiff answered, "I recall telling them it was an accident, yes, but I don't recall the other part of it." Defendant also asked plaintiff whether he had told other persons that "this incident was just an accident and that no person was to blame." Plaintiff answered, "I told people it was an accident." Thereupon the court said, "The question is, Did you tell other people that it was just an

accident and that no one was to blame?" Plaintiff answered, "I told people it was an accident, but I can't recall telling them no one was to blame." Defendant asked plaintiff whether he had told defendant in the presence of others on many occasions that defendant "should not feel so badly about it, it was just an accident and he was not to blame." Plaintiff answered, "I have told people it was an accident." Thereupon plaintiff was asked a few questions concerning other subjects, and defendant then asked plaintiff whether he had "on many occasions told your mutual friends that this was just an accident, and that Tex [defendant] should not feel badly, nobody was to blame." Plaintiff objected to the question on the ground that it had been asked and answered, and the court sustained the objection. It therefore appears from the above references to the testimony that the court did not err in sustaining the objection.

The judgment is affirmed.

Desmond, P. J., and Shinn, J., concurred.